Next case is No. 07-1553, Addison Huntsville v. Aten Intl. Thank you, Your Honor. May it please the Court? I'm Jay Berkowitz and I represent Madison. This is a patent declaratory judgment action involving two patents. The patents at issue both relate to computer switches, and Aten International, the patent owner, is a Taiwanese manufacturer of computer switches. Aten has not been reluctant to assert one of the two patents involved in this case. It has brought an action against several defendants in the Eastern District of Texas, another one against multiple defendants in the Northern District of California, and an action here in Washington in the ITC, all on one of the two patents at issue here. Nor has Aten been reluctant to threaten Addison with enforcement. They sent the letter first to Addison in Huntsville several years ago. The second letter they sent to one of Addison's customers, a customer that the two companies share, Amazon.com, and the third letter was sent to me more recently. It was that third letter that was the flash point that we decided we need to resolve this issue. In this case, the Alabama— The first letter was sent by Aten Technology, the U.S. company. I believe that's correct, Your Honor. Specifically, the first letter was addressed from Aten Technologies. The second one, I believe, was addressed from Iopeer, which I don't think that's a separate company, but that's an operating unit or a trade name that they use. And the third one to me was from Aten International. So each of their— The question is the jurisdiction of Aten International. That's correct, Your Honor. And why is the first letter effective in that context? Your Honor, we're not basically— Well, first off, there's only one patent on them, and that's Aten International, a Taiwanese company. I understand that. I question whether—why it came from a different company, but our jurisdictional argument is really not based on those letters. And I think that was the primary error that the district court made, assuming that a whole argument was they sent the letters, therefore we should sue them, and base it on Red Wing's shoe. That was not the case. Our primary jurisdictional argument is simply this. Aten International makes and sells these switches. There's no doubt, there's no dispute that the switches that are sold in Alabama under the Aten name, under the Iowa gear name and by Aten technology, they're all made by Aten International. Those products are distributed through a wide variety of sources, the first one being that they sell through their website. And that website, although it's published— Let me back up. What it says is that— It says that the— The way we got into it, to be honest, is we typed in Aten USA, which is their U.S. subsidiary. But at the back of that, and I think we point out in our briefing, at the back of that it points out that Aten International, the parent company, is actually the company that runs that website. So one of our declarants in this case went to that website, purchased a product, and that product, based on the sale of the website, was shipped to him in Alabama. Is there a principal method by which these products are sold? That is one of the methods by which they're sold that we're aware of. I think the principal method— The website was more informational than it was sales-oriented. It could be, Your Honor. I don't know who else may have made purchases through the website. I can only tell you that Joe Hellman was one of those people, that he did go in and execute through the website a full purchase, and the product was shipped to him. One product. Right. But that's one product from Aten International. But I agree with you. I think the primary distribution is through the elaborate channels that they've set up. You can walk into any of the Best Buys in Northern District of Alabama, apparently, and find the Aten switches. And we put in declarations to that effect. They also sell through other approaches. So you think that the Justice Brennan view of the stream of commerce theory is behalf of the whole proper view and applies in this case, which is just the fact that the product was sent into the stream of commerce from Aten International through Aten Technology, and, of course, from Aten Technology through Best Buy, Amazon, et cetera? I think that's true, Your Honor, although I won't say exclusively because if I understand your question, there's the question of do you need, is it stream of commerce plus or just stream of commerce? In this case, I don't think we need to make that decision to answer that question either. This court has taken up at least two occasions that I'm aware of and said, well, in this case, we don't really need to decide. I don't think you need to decide that here either because whether you look at the enforcement threat letters as sort of the basis for the cause of action and the sales were the plus or the sales and their distribution through commerce as being the basis for jurisdiction and the threat letters were the plus. I think that we do have here that there's both. You can't ignore it. I think that's one. That's not much of a plus if we get back to those letters again. You've got one letter going to Amazon in Washington. You've got another letter going to, as I understand, to Amazon in Redmond in Washington related to a different lawsuit, and you've got one letter sent by a U.S. company. Not much of a plus. There is a plus, Your Honor. The patent owner itself sent a letter. Now, I don't know if that was the one that went to me, but the one that came to my office was in Arlington, and there have been cases where the decision was that even though the letter went to the attorney, I think it was the case where the attorney was in North Carolina, that they said obviously it was meant for the recipient who was where they were headquartered. There were actually no letters sent into Washington State. But there were three letters. Whether you look at, frankly, two of those letters probably shouldn't have been sent by the people that sent them. What I don't hear is that doing business as named in A10 U.S. is not the patent owner. Now, I'll tell you one of the reasons why this is confused is that it'll probably take me a minute to find it, but you have to find it if you want it. The way A10 holds itself out is very interesting. They describe themselves in their letters as well as in other literature, their own press releases. They hold themselves out as A10 U.S. doing business as A10 International and Iowa Gear. Now, we're not relying on that. I mean, they do create confusion with that, and they do create confusion by having different entities send the letters as though they all own the patent. But we're not relying on that. Suffice to say, the right patent owner sent one of the letters. So even if you ignore the other two as being inappropriate, that was inappropriate to them. But there certainly was that other factor. I do think, however, that the real key here is we looked at the case at the outset of the district court, and we said, you know, this is a Beverly Hills fan case. This is a buy-in case. And better than that, and here's why. Because each of those two cases, there's a foreign manufacturer who built a product and shipped it to the United States. In both of those cases, they distribute it within the United States through a non-corporate-related entity. And then those entities, in turn, sent it to the foreign state where the suit occurred. In both cases, this court found that jurisdiction was appropriate. I think we have a better argument in this case simply because the U.S. distributor is, in fact, a corporate entity that does confuse the issues who is A10 U.S. and who is A10 International. There's an interesting question here, a sort of fundamental question. You understand the sort of stream-of-commerce theory and how stream-of-commerce affects personal jurisdiction when the lawsuit is by a patentee against an accused manufacturer, distributor, seller of goods. But here, we have declaratory judgment action. So the question is, what relationship do any of these activities that we have been talking about have to personal jurisdiction of the patentee? The question is, in the litigation, the question is validity of the patent, infringement of the patent. What personal activities of a patentee should subject it to jurisdiction in a declaratory judgment setting? Judge, I frankly had to scratch my head at that issue when this first started because it does raise the question, where can you sue someone who's being assertive of their patent but won't pull the trigger and file a lawsuit? Or let's say somebody has a patent and is being very assertive. Does the manufacturer offend them? Well, that would be a red-winged shoe case, and that would be a problem for us. Fortunately, we don't have that problem because they are manufacturing. And red-winged shoe, which is the case the district court relied upon, made the distinction saying, in this case, the patent owner doesn't make anything, so he can't apply stream-of-commerce. So then the question is, do they make things? And does it matter whether what they are making is covered by the patent or not? It does not, is our position on explaining it. Well, if it does, then it would seem a little odd. I'm sure you would agree with me. You would have to prove sort of a threshold infringement case before you can find jurisdiction to prove your infringement case. I will agree that I'd hate to go through a Markman analysis and hearing to prove that we should have jurisdiction, yes. Was there any question as to whether Aten could have been sued for infringement in Alabama versus Brazil? I don't think there's any contention they could have. We manufacture a product in Alabama, and that's where we're headquartered. I don't think there's any question that should Aten have chosen to sue, they could have sued us in Alabama. But, Your Honor, I don't believe I've answered the first question that started this. And that is, why would we hold a patent owner to jurisdiction in a particular form where really the analysis that Beverly Hills Ban and other cases put forward is for when there's infringement? And that's where I was scratching my head. And the answer is, I think, well explained in the buy-in decision. And that's one of the cases that we relied on at the district court level and in this briefing. And the argument there is simply this. It isn't a question of whether their conduct is right or wrong. The question is whether the court where the action has been brought fairly has jurisdiction over that party. And it answers the question by saying, we think the same analysis that applies when it's the patent owner bringing the suit would apply to, in this case, except look at the context of the case. Jeff, you're not saying that because Avison can be subject to personal jurisdiction in Alabama, then it follows automatically that in a DHA context, then ATAN automatically should be subject to personal jurisdiction? No, Your Honor. It's not the focus on Avison, whether Avison could be held there. The question would be, under Ryan, we should look at the context still of the patent owner with the form state. You don't jump over that. You still have to do that. And that's what we come back with resoundingly. When I first saw that they were challenging jurisdiction, again this freshman answer, I don't understand this. You can buy their product in virtually every electronic store in Alabama and they put it there. How can they come in and say, well, the people we sold to, our U.S. subsidiary, in turn sold to Best Buy and CDW and all these other companies, and by chance it might be in Alabama. I think that the buy-in decision will be instructive as to your question. Does that mean that ATAN International is subject to jurisdiction everywhere in the United States because Best Buy sells everywhere? That may very well be, Your Honor. I have not looked at that question. I don't know that the factual predicate is true. But if they – I mean, it was their whole point to distribute as broadly within the United States as they could, and they succeeded at that. To the extent that Best Buy does have stores in all 50 states, I think the answer is yes. And Beverly Hills Family – Certainly Amazon.com is selling everywhere. I'm sorry? Amazon.com is selling everywhere, so I think we don't need to assume too much. Then I agree. I think they're selling through Amazon.com. So ATAN International, under your theory, is subject to personal jurisdiction anywhere you want to sell. So long as they actually sell products, their products are sold in that state, yes. And I believe that Beverly Hills Family and Valuable say that. Let me flip the question and say, if we can't rely on the Street of Commerce, where can we sue them? And it's only where they are. They can sue them in the District of Columbia. They are amenable by statute to sue in the District of Columbia. Are they not? They are, but, Your Honor, my client is in Alabama, and the products were designed and manufactured there. That's where most of our evidence is going to be. And you probably would have a fairly straightforward case in the places where they have the right to initiate litigation. Not really, Your Honor, because once we get away from where the designers of my product are, because that's where the issue is, my product in French, then the only place we'd sue where it's easy for their evidence and their witnesses would, frankly, be in Taiwan, because presumably that's where it was developed. Those were the inventors. So there's not going to be a U.S. location where it's more convenient for them. It'd just be a court that they'd rather be in. Well, it's not a formal non-convenience court. It's a jurisdiction. That's right. Your Honor, if I could just say one last thing. I realize my time is out. And since I believe I've eaten up all of my rebuttal time as well, if I could just say one thing. No, no, no. We'll stick out about two minutes. Oh, thank you, Your Honor. The one last thing I'd say is that they've told this court that we have not demonstrated that the patented product that A10 sells is sold in Alabama. And I believe, and I'd be happy to walk you through the evidence on rebuttal time at any time if that should be necessary. Not as well as I would cover it if I showed you the actual evidence. I won't do it right now, but the evidence is there that shows that what they say is patented, if you look at their press release and look at the product they describe as being covered, you'll find that it's both at CompUSA and Best Buy, and that's one of the products that our declarant saw on the shelf when he was at the store. Thank you. Thank you. Good morning. I'm Steve Hemingworth. I work at CompUSA. I'm a developer at A10 International. With regard to Judge Lynn's question as to whether A10 International is a member of the service process under these patents, everywhere in the jurisdiction, merely because they sell products or their products end up being in retail stores, that is incorrect.  where A10 International is in fact subject to personal jurisdiction. You apply this for a three-pronged test, which is very well set out in the Breckenridge Pharmaceutical case. Number one, there must be purposefully directed activities by A10 to the district. Two, there must be a relationship between those activities with the district. And in this case, neither of those prongs are met, and they cut through all the plaintiff's arguments here. But do you still have the problem with the letters that were sent to Alabama? Well, you say we have a problem. Brett Lynn Shue, I think, clearly set forth the law that letters alone are insufficient to establish jurisdiction. Now, they have said, well, these letters, plus the fact that A10's products can be purchased in Alabama are sufficient. But this court has addressed that as well in the Silent Drive case. The issue there was certain letters that had been, in fact, written and directed for cease and desist, and then there was other unrelated activities going on in the case. And the court said you can't take zero and zero and get one. In other words, cease and desist letters don't do it alone and cannot be the bridge to make other activities related to the litigation. And if one were to look at the record below, there is absolutely no allegation in the record below that the products that were purchased are, in fact, the patented products. Why is that important in this case? Because that is the, if you will, the lynchpin of their infringement arguments, namely that they have activity, their products can be acquired in Alabama. It doesn't matter. That doesn't relate to the subject matter of the litigation, namely the patents. The other problem in their analysis is that in the lower court, there is also no allegation of control between A10 and these distributors that distribute the products. And while plaintiffs have said it's not their burden, was it denied that the products came from A10? It was not denied that the products that can be purchased in Alabama were originally manufactured by A10. What is denied, and where there is no evidence, no allegations made whatsoever except in their reply brief, that there is any control that A10 has directed the distributors or done anything to point to those products and say, sell those in Alabama in this jurisdiction. So you're failing the first prong of the purposeful directive activity by A10. Is it not enough that A10 International set out through its U.S. subsidiary to sell products in the United States through such channels as Best Buy and Amazon.com, which I'm sure gave rise to a reasonable expectation that the products would be sold everywhere? It is not important because that would then fall into the problem of someone who is not purposely directing the activities. Without that link, you run into the problem of directing by this purposeful availment. And the issue that you're talking about was actually, I believe, addressed in genetic implant. In that case, in Minnesota, they found that genetic implant had 34 licensees, six of whom actually had the retail stores that sold the patented product. And in that case, they said that is not enough because there is no control between the licensee. There's no control between HHI and the licensees. And therefore, there was no purposely directing of the sales to the forum they were in in Minnesota. Getting back to the- What's your response to Mr. Berkowitz's reliance on the Viam case? Viam is, in fact, a State of Commerce case. One of the distinguishing factors that we have here is in Viam, there was a direct relationship between the lawsuit and the products that were sold there. Specifically in Viam, when it talked about the conditions and the factors that are to be considered, it found that the patented products were, in fact, in the jurisdiction. That is one big distinction that we have here. I think that this- And also MACRA, if you look at that case, were the first ones to do this kind of problem. They also found that the patented product, the thing that was being sold there, was, in fact, one of the touchstones to determine whether or not there's a relationship between the lawsuit and the activities in the forum. Now- Does that mean there has to be some threshold showing that the patented product is covered by the patent? It's sort of a mini infringement suit to establish jurisdiction? Well, no, I don't think that's the case, Your Honor. Certainly Viam and ACRO and others, those facts certainly made it in. This gets back to the problem where I mentioned at the beginning. There are no allegations of contacts. They did not allege in the district court at all that the products are covered by the patent. If they had, we would have researched, gotten into it, made a determination as to whether it's rebuttable or not, and we would have gone forward. It is a fundamental allegation that is missing from their complaint and cannot be, and even the papers belong, cannot be supplied here. In fact, the district court, in discussing Viam, came in and said, I'm looking for the relationship between the activity and the forum, and that was the first time he came up and said there is no relationship, and that was only on appeal that plaintiffs first began to allege that the products are covered by the patent. What kind of conduct on the part of a patentee would satisfy the purposefully directed law of the test? There are many cases in this court that provide instruction, and frankly, the opinion in the Breckenridge case set forth a synopsis of many of the cases, and in fact was quite helpful. Unfortunately, not helpful enough to clarify the law, so we wouldn't be here, but you look at those, and they talk about some activity, some exclusive licensing control, the right to be sued, and particularly in the Breckenridge case, in that case the patentee was not in Florida at all, but Farm Lab, who also was not in Florida, they went and they had an exclusive license agreement and were combined doing activities in Florida. It is not hard to find those types of activities that are directed at the forum. So you're saying that stream of commerce cases like Beverly Hills Bank don't apply because there is confusion on the facts? Yes, Your Honor. In Beverly Hills Bank, that was kind of the traditional stream of commerce, and actually in the traditional stream of commerce cases, you don't have so much this issue about the product going into the stream of commerce, whether or not it's related to the lawsuit. Because, for example, in Beverly Hills Ban, the product that was going into the jurisdiction was the one accused of infringement, and hence doesn't interest you. It wasn't denied, was it, in terms of the ultimate source of the products? In our present case, it is not denied that AITM manufactures the products. What is denied is that there is no showing that the products that are available in Alabama have anything whatsoever to do with the declaratory judgment of the two patents that are issued here. Would your argument be the same if there was a patent marking on the product? If there was a patent marking and the allegations were made in the district court to that effect and unrebutted, I would say it would make a difference. But that's not the case we have here. I don't know, because I would have thought that there would have been a burden in the way it was presented, that in fact an employee had gone to a local shop and bought these things. And there they were purchased, perhaps produced, before the district court. And if the origin of those products were not disputed, and if it was not disputed that these were products issued, products for which the insert product is accused of infringement, that they're trying to extend the connections where the burdens are. I had the impression that there was no issue as to any of this, that it was more a matter of there was no personal jurisdiction, because it was just a matter of safety. Well, actually, in the lower court, that was the position in their opposition group. That was the plaintiff's position. Their position has moved. In fact, it was only in their survey ply that it really hit on the buying case in the lower court. But setting all that aside, if indeed someone had gone to the store, purchased an AITM manufactured product, had made a notation and an allegation that it's covered, even if they had alleged that it was covered by the mere inspection, that would have shifted the burden to AITM International to rebut that. I agree with you. That was really my concern. This is a presence. If you look at it as to whether, in fact, that establishes a presence, does it matter? Whether or not the presence is established through the patentee's consent of a product covered by the patent that's now attempting to be put to issue or not, maybe it doesn't matter at all. Well, again, we have to look at all the facts. The mere fact that a product manufactured by somebody is in a jurisdiction doesn't automatically convey personal jurisdiction. No, but also sending a threatening letter. Well, you still would have to establish that the product was related to the lawsuit, and that was addressed in the silent drive case. So even if they had gone in and we admit they purchased a product there, we admit that our products are available there, but one, the fact that a product that is sold totally unrelated to the patents is available should not subject a patentee to jurisdiction in every forum. What relationship does the patentee's sales of any product have to the issues relating to the declaratory judgment litigation? The questions there would be whether the patent is infringed by another or whether the patent is valid or invalid, whether the patent is enforceable or not. What relationship does that have at all to any sales by the patentee? You mean even ones covered by the product? Right. At least an argument can be made that the patentee is then exploiting his technology and patent in the forum. However, if I had a case and the only connection was the patented product was available in that forum, I would say that was not enough because, remember, you have to have these kinds of purposely directing the activities at the forum, and even if the patented product was there, you still have to show that the defendant, Aten in this case, caused that to be there and directed their activities at that forum. So neither of those prongs are met here. But what activities are directed? If cease and desist letters themselves don't count, what activities can a patentee direct to a jurisdiction to expose himself to personal jurisdiction? A good example is the exclusive licensees that we have in Akron. There, LUPRO, after they engaged in the cease and desist letters, went ahead and established an exclusive license agreement with someone particularly in that forum. That is an example. You know, all of this precedent was really before what I'll call the liberalization of the authority for someone with an accused infringement to bring declaratory action. And what's troubling to me about this case is recognizing that these rules have changed. What else perhaps needs to be changed in order to accommodate the principles behind the Supreme Court's approach that it ought to be easier to review our issue before the courts? And the search by this accused infringer for presence sufficient to satisfy the personal jurisdiction aspect perhaps also needs to be looked at with a little more flexibility. Well, I think the liberalization of the stream of commerce test, which is an offshoot of specific jurisdiction, and if you look at Burger King, the citation of it in terms of worldwide Volkswagen, it said the product has to cause the injury. So the stream of commerce test is really not easily that applicable to the current situation of the D.J. I'd take a little exception with it if I am, but it is the law. I have difficulty in really seeing how mere fact that someone puts a product into the stream of commerce causes injury or relates to the patent. And in fact, Congress took care of this issue if you talk about personal jurisdiction, and mainly if they want to sue for declaratory judgment, they can internationalize obviously the service process in the District of Columbia. So I do not think in this case we need to change the law or enhance the law of the stream of commerce. I think what we need to do is to continue to apply the three-prong test and require the plaintiff in a D.J. action to present the activities using the Breckenridge case as a guideline to determine how things should be played. Any more questions? Thank you. Mr. Griffiths, you may have your rebuttal time. Thank you, Your Honor. If you don't want to use it, I'll try not to. In fact, Your Honor, I just have two points I wanted to address. The first one was I was a little surprised by the argument because I didn't see it in the brief, but the way A-10 is now interpreting the requirement of purposely directing product to a jurisdiction would undo all of this Court's established precedent in Beverly Hills Van and Byad and all the other cases. Because what they're saying is if I send product from Italy or from Taiwan to my distributor in the United States, and then they in turn distribute it, whether it be to Builders Square, Home Depot in Virginia, as in the Beverly Hills Van case, or to automotive stores in California, as in the Byad case, that there be no jurisdiction in those states unless the foreign supplier told that distributor, oh, and by the way, I want you to send it to those states. But those are still cases in which that particular device might itself be accused of infringement. Here, in the declaratory action, we do, we leave, and we don't. What's your take on that? And that was the second point that I wanted to raise. But the answer is no, because this Court has looked at it, and it's cited in my brief, but I'll just remind the Court, it's genetic implant systems from 1997. And there, the Court found that in a death judgment action, jurisdiction was appropriate over the patent owner, even though the patents at the time of the threat letters, the patent had not issued yet. So there was no patented article being sold at that time. So this Court has looked at that issue, although not in exactly the same circumstances, and said no. Just this past week, in preparing for today, I noticed that this Court's acquittal decision from 1995, it referred to a case out of the Eighth Circuit in 1973, so by no means recent law, and certainly before the liberalization of jurisdiction. But the Eighth Circuit looked at a question where in that case, although it's not even argued here that this is what Aitken has done, and I think it defies common sense to suggest that they've withheld the patented product from a particular market without any proof at all as to that, just saying we haven't proven it. Well, I don't think that's a burden for us to have to prove. But in that case, there was evidence that the patent owner had withheld product from that market, as an effort to try to limit jurisdiction. And the Eighth Circuit said no, because they had lots and lots of other products. It didn't have to be the patented product. And so I think both of those are helpful in understanding, but I don't think that they necessarily control this particular fact situation. Your Honor, the reason why the issue of whether the patented product was sold in Alabama is really not in the record before you in the way that I wish it was is because neither party raised that issue in the briefing below. The first time it came up was in Judge Smith's holding, and frankly his holding was, this isn't the case for jurisdiction because those letters aren't enough. And he really split all of the facts and said this is for specific jurisdiction and this is for general jurisdiction. And he didn't really look at the whole stream of commerce analysis as unified, in a unified way as this court does. But the first time the question of whether the patented article was sold came up in his holding. And so that's the reason. I didn't think it was an issue. Frankly, I don't think A-10 thought it was an issue or would have been briefed. And for that reason, that's why when it came up before, the one thing I'd like to share with you is if it is important to jurisdiction, and I don't believe that it is or should be, that there's no question that A-10 does sell their patent, what they claim to be the patented product in Alabama. If you look at JA-414, basically this is a person who's from Iowa here, and what they say is they say the 112 patent relates to switches or KVM switches having cables attached there to it. And then they can such as, and they identify a specific product, the Mini-Q microseries. And then they do a similar thing a little later on in the letter from Iowa Gear to Amazon where they say our patent covers any KVM switches with attached cables. Well, what does that have to do with Alabama you might be asking? Well, the point is, when we went into the CompusA site, and this is attached to one of the declarations, it's JA-350, what it shows is that Iowa Gear GCS-632U Mini-E micro KVM switch, precisely the product that they say in the press release is covered by the patent. Whether we agree with them or not, that's what they said. And as you can see from that picture, the cables are indeed attached. And then if you look forward to what was… I think we have that point. In fact, I'm going to ask Mr. Manning if there's anything that he wishes to say in response to this report that you're bringing forward. We have the opportunity. Thank you, Your Honor. Do you need to have the podium for that? If I may, just to address that one last point. Once again, AITN does not dispute that its products and its patented products are available throughout the United States. What we have here, again, is a failure of pleadings and allegations in the district court. That product, which is on the CompusA website, was not purchased or acquired anywhere in Alabama. But then even if it had been and it were a patented product, we still have the problem that there is no allegations in the district court, even here, that there is control. Only inferences.